Good morning, Your Honors. Good morning. Audre Bonnet. May it please the Court, my name is Audre Bonnet and I am representing Ms. Golkar. Ms. Golkar is a U.S. citizen by birth. Ms. Golkar's parents have extensive ties to the United States. They've both been educated here, they met here while in college, they're married, they have their daughter here. Ms. Golkar petitioned her parents so that they could return to the United States. Her parents are citizens of Iran and naturalized citizens of Canada. The immigrant visa petitions that Ms. Golkar filed on behalf of her parents were approved by CIS and the U.S. Consulate approved Ms. Golkar's mother's immigrant visa application but denied her father's visa application. The government contends that Ms. Golkar does not have a constitutionally protected liberty interest and the government argued that this Court's ruling in Bustamante v. McKaysey was incorrect in finding a liberty interest for U.S. citizens petitioning family members and that the ruling should not be followed nor expanded upon. However, this Court did that in Rivas v. Napolitano. Rivas involved a U.S. citizen daughter petitioning her father. This Court did not find that she lacked a liberty interest but the government contends that this Court did not consider the issue of a constitutionally protected liberty interest. But that doesn't seem possible. In Mandel, the U.S. Supreme Court addressed before reaching the issue of the consular non-reviewability doctrine, they first addressed the issue of whether the group challenging that visa denial had a constitutionally protected interest. And in Bustamante, that was also the first step that this Court took in its analysis before turning to the issue of a facially legitimate and bona fide decision. And this Court remanded the Rivas case, which would not have happened if the U.S. citizen daughter lacked a constitutionally protected liberty interest. And in Bustamante, this Court held that there is a freedom of personal choice in matters of marriage and family life, and that is one of the liberties protected in the due process clause. Is there any case that's involved a relationship between an adult child and parents? To my knowledge, Rivas was the first case in which that was the scenario. Prior cases involved spouses. But under this premise, under the premise of Rivas and Bustamante, Ms. Golkar, as a U.S. citizen, should have the right to challenge whether the consulate's procedures in adjudicating her father's application were in accordance with the law and set procedures. Now, the issue in this case is whether the consulate issued a facially legitimate and bona fide decision in Mr. Golkar's visa application. We do agree that the consulate issued a denial of Mr. Golkar's visa application, but Ms. Golkar contends that the denial violated the Immigration and Nationality Act, the Code of Federal Regulations, and the Foreign Affairs Manual. In 2008, the consulate issued a generic denial letter to Mr. Golkar which stated that his application was denied under INA Section 212A, which encompasses every possible ground of inadmissibility. Now, Ms. Golkar was persistent in trying to find a reason for her father's denial, including contacting Congressman Waxman. What are you seeking? Pardon me? What do you want us to do? Ms. Golkar and her father want to know why he was denied. They want to know that the consulate – they don't believe that the consulate followed the Foreign Affairs Manual. They believe that the issue, the denial, was not facially legitimate and bona fide. Why? First of all, they weren't given a reason why he was denied. And assuming that the reason was actually under security-related grounds, which has not been – which is not clear, then it was in violation of the Foreign Affairs Manual, which would not make it a facially legitimate and bona fide decision. What's the authority for saying that a failure to file a manual rises to the level of a violation? Well, this court in Singh v. Clinton, 2010, relied upon the Foreign Affairs Manual in determining whether the consulate had properly issued an immigrant visa application. And I can actually quote the quote on that one. I believe it was Judge Fischer who stated that specific procedures for implementing statutes and regulations governing immigrant visas are set out in Chapter 42 of the Foreign Affairs Manual. What opinion is that? That was Singh v. Clinton, Your Honor. And I put the exact citation in the letter brief. Would you like me to provide it to the Court now? No, that's okay. If you've already submitted it, that's fine. I don't – when did you send that in? I'm sorry. The letter brief was submitted on April 15th, Your Honor. The Court had requested both parties to submit letter briefs specific to Revis. All right. Great. You talk so fast and you lower your voice that I'm – my Foreign Affairs Manual is just kind of – I apologize, Your Honor. That's all right. You just try to project your voice. It'd be better. Yes, Your Honor. What is the significance of Congress Waxman's letter that came in two years after the administrative decision was made by the Counselor? What Counselor? What is your thought about the significance of that, if any? Well, Congressman Waxman wrote a letter in response to Miskell Carr's request, but the code section was incorrect. It was not a proper code section. Miskell Carr was trying to decipher it and thought it was meant to be the security related ground. First of all, that letter didn't come from the Consulate. It didn't come from the Department of Homeland Security. The State Department. It came from Congressman Waxman's office more than two years later. So his one-year opportunity to rebut the grounds of denial was long gone. Did you raise that as an affirmative issue in this case? Have you raised that as grounds for action by this Court? It was the code section Congressman Waxman stated was put in the complaint, as it was stated, which is an incorrect code section. And this case actually never went to a hearing. It was filed on motions. And in the response brief, yes, that was exactly addressed, that Congressman Waxman wrote it this way, and assuming that was the word, assuming that was meant to be security related grounds, then the denial was handled in violation of the Foreign Affairs Manual. Now, specifically what Miskell Carr stated was that the Foreign Affairs Manual requires, well, the security related ground is broken into two sections. The first section is whether the person engaged in espionage or sabotage. And if that's the case, it requires a denial under Section 221G of the INA. As that's stated not only in the Foreign Affairs Manual, but that's also stated in the Consolidated Appropriations Act of 2004, which had amended Section 221G. But this case was not denied under 221G. It was denied under 212A. And that leads to the second half of the provision of the security related grounds, that an applicant is inadmissible for exporting goods or technologies to which citizens of Iran are one of the four countries subject. Now, this section can be violated unintentionally by exporting goods in violation of the executive order on the economic sanctions for Iran. But a denial under this subsection requires providing the G. Kennedy, what information did your client initially receive from this? No. He received a generic letter from the consulate that said your visa is denied under Section 212A. Under 212A. The next information he received was that. Okay. And so you looked at 212A? Yeah. 212A encompasses every possible ground of inadmissibility under the Immigration Act. Everything. It's about 15 pages of fine print. Correct. Exactly. All right. So she wanted to know why. What you really want to know is why your client's father was denied a visa. Right? That's correct. And then you got information through the Congressman's office that the denial had to do with espionage. Well, the denial of the section written by Congressman Waxman's office. Espionage is sabotage. Right. The code section written in Congressman Waxman's letter was actually not a proper code section. It was something was missing. I'm sorry. One letter or one number was written. I know that, but we know that now. We deciphered or Ms. Golkar deciphered it to be or believed it to be the security-related ground. That's not clear. Well, it's a little lie instead of a one. Right, right. So that's why she's trying to decipher saying this may have meant the security-related ground. Although I can't say to this Court absolutely that's what it meant. That's us trying to decipher what the letter meant. And what she's arguing is let's assume that is the case. That was the grounds of denial. That came two years after, not from the consulate, the State Department, the Department of Homeland Security. What prejudice? You haven't alleged any prejudice or proffered any prejudice from the delay. Well, Your Honor, let's assume this was under the security-related grounds. It was under the economic sanctions, which is part of the security-related grounds. He should have been afforded an opportunity. He should have been told, first of all. And he should have been afforded an opportunity to rebut that. Well, did you seek it? He didn't know at the time. During his time period, he was told he was denied under 212A, and he had no idea why. No, but after you got the information from Congressman Waxman, did you seek to provide any rebuttal? No, that was over two years after the denial. The one-year period. So you didn't submit it. Right, because the one-year period had closed. Why? Because the one-year period on that visa application had elapsed. So you didn't even broach it to the authorities to say, okay, now we've got it, and we tender our rebuttal. Right, but the first thing we'd have to determine is which section under the security-related grounds. Well, you're assuming it. I am. I am taking the assumption that it's under the economic sanctions. Okay. But the Foreign Affairs Manual requires them to provide more information. Why do they believe this? Did you ask then, once you got the information, what steps did you take to go back to the agency to now pursue, even if it was out of time? You could say, you know, it's out of time, but it's your fault that it's out of time, and here's our rebuttal or the clarification. Right. The consulate, when Ms. Golkar and her father pushed the consulate for information, which they extensively, they went through every avenue they knew, the consulate refused to speak to them. The consulate refused to provide any information. I understand. What did you do after? Are you arguing now futility? Yes. I mean, after the one-year?  So what she did was brought this complaint here. But you got it through the consulate. You went to Henry Waxman, and they provided the information. They were able to get it from the consular office, right? Right. And then with that, you then initiated the litigation. From my understanding, she did attempt more dialogue with her father. Her father attempted dialogue with the consulate, but the consulate doesn't want anything to do with the case. They said they made their decision. They wouldn't communicate with him directly or with Ms. Golkar. They only communicated through Waxman's office. That's in the record? There has been nothing submitted in the record. We had no hearings on this case. About the consular saying that they wouldn't deal with your father or with her father or her directly? No. There's been no evidence submitted in this case. Other than the complaint and the government's motion to dismiss, there's been no evidence. There's been no testimony. So all you really know is what you got from Congressman Waxman's office. That's correct. And he sent a letter to you, didn't he? Yes, he sent a letter. Sent a letter. But you got nothing whatsoever from the State Department. Correct. Other than the initial denial. Other than the initial denial. Correct. That set out all this information in Section 1180 to 15 pages. And after you found out that it was espionage or sabotage, then you saw it had something to do with economic matters. Right. And then, but did you then seek to get specific information on, well, what the consular had? Anything specific from the consulate to espionage and sabotage, you know? Right. A wide range. So what did you do after that? A prior attorney, before they came to my office, a prior attorney did file a Freedom of Information Act, which they did receive. But it didn't contain any information on the consulate's decision. It only contained the initial applications that were submitted from Ms. Golkar or Mr. Golkar to the consulate. And it contained just the generic letter saying you're denied under Section 212A. They didn't include any information relating to the grounds of denial. Let me ask a question. If you go to Regulation 42.81, it provides under B, quote, the consular officer shall inform the applicant of the provision of law implementing regulation on which the refusal is based and of any statutory provision of law or implementing regulation under which administrative relief is available. Are you claiming that that was not done here? Absolutely. But the government is arguing they're not required to do that. They're not required to follow that. And what's your response to that argument? First of all, we don't know that it was security-related grounds. I can't say absolutely. Speak a little slower. Sorry. It just goes like that. I mean, I'm not used to all this modern communication. First of all, I'm not going to say absolutely certain it was security-related grounds. But assuming it was security-related grounds, it still should have complied with the Foreign Affairs Manual, which this case did not. And then when you got Waxman's letter, you're saying that it came in after the one-year deadline to present additional evidence contrary to what the consular had provided as a reason. Is that what you're saying? Yes, Your Honor. Okay. All right. I note that my time is up. Is there any additional questions? Well, we'll hear from the government. Okay. Thank you, Your Honor. Can I ask you a question? Yes. No. Why don't you let her introduce herself? Good morning, Your Honors. May it please the Court, Melissa Liebman on behalf of the United States. Good morning. Good morning. All right. I have your name here somewhere, so I know who you are. I've got you identified. Thank you. Can you hear me okay? I can hear you fine. Thank you. I can hear you fine. So the first notice that was received here from the consulate was the reason for the denial. They cited 1182A, right? That's correct, Your Honor. And so we're dealing there with basically Sections 2 and 3, and that's just a whole, practically every ailment and disease and problem known to mankind is in those, I think, 15 pages. So they want to find out specifically the specific reason for the denial. He's a Canadian citizen. He's living in Dubai, I think. And so what were these people supposed to do to get that information? Let me see if I can answer your question. It has a couple of different parts to it. The first was regarding the grounds for the initial refusal. There were two separate determinations by the State Department in this case. The first was a refusal under 1201G. That is the statute that says that no visa shall be issued to an alien if it appears to the consular officer from statements in the application or in the papers submitted therewith. Could you talk into that microphone, please? Sorry. That such alien is ineligible to receive a visa or other such documentation under Section 1182 of this title or any other provision of law, or that the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or other such documentation under Section 1182 or any other provision of law. So the first letter that Mr. Golkar received in this case was an initial determination by the consular officer because the consular officer is required by regulations to issue a refusal or approve a visa at the time of the application. So when he went and presented his application, the consular officer determined that it appeared that he was ineligible based on the information they had, and they initially refused the visa under 1201G, and the letter stated that the denial was under 1182A. Those bases are one and the same. Okay, so Mr. Golkar did receive a specific statutory ground. Admittedly, there are many reasons that that could have been, but that is how consular officers who believe that there is going to be a further reason for a denial initially refuse a visa. That is how they are required to act because they have to do it at the time. Following that, the consular officer, reviewing the information available, made a determination that Mr. Golkar's visa should have been refused under 1182A3Ai, which has two separate provisions, but the specific grounds are not required to agree. Wait, wait, wait, wait. Okay. So now it's 1182. Little A. Little A. Three. Big A. Wait a minute. Maybe I can go through faster. Big AI. Is that what you're saying? Yeah. Big A, small, Roman numeral I. Okay. Big AI. That relates to any activity to violate any law of the United States relating to espionage or sabotage, or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information. That's correct, Your Honor. And that is the ground that was specified in the letter that Mr. Golkar received from the Congressman Waxman. Oh, I see. But is it significant that the Congressman's letter did not correctly cite to this? No, Your Honor. Why not? And that is because the statute under 1182B3 provides that the State Department is not required to provide the specific grounds for the visa refusal if the refusal is under a security ground that's in 1182A2 or A3. Mr. Golkar was not entitled to know the specific statutory provision that his visa was denied under. However, he subsequently obtained additional information about that. He's not prejudiced because, even though a year has passed, any applicant for a visa at that time. He submitted, as he alleges, we're going on the allegations that are in the complaint, Your Honor, and he alleges that he obtained that information from a letter from the congressional inquiry. Okay. Let me ask a question. Why did the consular's later explanation of this specific ground come from the Congressman rather than the consular? I don't know the answer to that. Isn't that irregular and atypical and improper maybe? I wouldn't say that, Your Honor, that it's improper. I am aware that congresspeople typically do send requests in, and that is one of the ways in which information can be received by individuals, that it's not unusual for a congressman to submit requests for information. In fact, there's someone from the State Department is actually located at Congress because so many requests are made. So it's not unusual. Why wasn't it sent to the applicant? I don't know the answer to the question, Your Honor, and it doesn't matter here because they weren't even entitled to that amount of information. I know, but, you know, we're the United States. We're supposed to be nice people. We are nice people, Your Honor. But I don't know that we are. But Congress made clear that certain bases for visa denials are not required to be provided to individuals. And there is no So the congressman got it. Did he get a letter or was this on the telephone? The complaint alleges that there was a letter that was received from the congressman. We don't have a copy of it. We don't have a copy of it. The complaint alleges that there was a letter, and that is the record here, Your Honor. There's no copy of the letter in the record. That's correct. Okay. So what you're saying is, okay, he got a high level of generality, pursued it, found out that it was under this A, big A, little i, which would include two possible grounds, any activity to violate the law of the United States relating to espionage or sabotage, or, secondly, to violate or evade any law prohibiting the export of goods, et cetera. So at that point in time, he knew he had been denied under one of those two options. That's correct, Your Honor. Now, did he have any remedies available at that point? Yes, and he has always had. Well, since the one-year period expired. No, Your Honor. He has always had remedies available to him. Any visa applicant may submit additional information to the consulate and submit a new application at any time. An individual abroad is never precluded from submitting a new visa application, and an earlier application doesn't preclude them from at any time providing additional or new information to a consulate anywhere in the world. So at this point, let's suppose the inference he has available to him is that he could look at his own activities and kind of intuit what it may be that got him flagged like this, and he could submit a new visa application specifically addressing the issue on which he had been previously denied. That's correct, Your Honor, and he could have done that at any point. At least generically. Yes, Your Honor. And he could still do that today. He could do that today. He could have done that at any point in time since this case has been pending and since the initial visa or even before. He has never been precluded from submitting additional evidence or further evidence or explaining the reasons why he merits a visa. Well, when he was turned down the first time and told about 1182A, they put a little information sheet. If you're not happy with this or if you then you can submit another application. Now that you know, say that it's got to do with sabotage or espionage or any activity to overthrow the government, and you've thought about it and you still don't know what we're talking about, you could file another application. Do we tell them this? I don't know if he was specifically told, but there's nothing precluding an individual from submitting further evidence or a new visa application at any time. And, Your Honor, I see I'm running out of time. But, you know, I'd like to understand this process and what's going on. The regulations require that a consular officer is required to either issue or refuse a visa at the time of application. I understand that. That requirement has been met here, Your Honor. And they can file a new application any time they want to. That's correct. And then how do they get a hearing in any way? No, Your Honor. Neither the statutes nor the regs nor the FAM provides for a hearing on a visa application, a detailed interview like they allege. None of those, none of the things that we consider to be required for a hearing in the United States, for a benefit application, none of those things are required in the provisioning of visas abroad. And that goes to- When you say visas abroad, that's because he has to apply outside the United States. He's sponsored by his daughter. That's correct, Your Honor. But it would all happen overseas. Exactly. And this all went down at the United States consulate abroad in, I believe it was the United Arab Emirates. And this all goes to the reasons why Congress, I'm sorry, the Supreme Court and this circuit and all the other circuits have upheld the doctrine of consular non-reviewability. And the doctrine insulates the decisions of consular officers from review. Even the very limited review that is available to an individual under Mandel or under Bustamante is extremely narrow. All it provides for is that if a United States citizen can allege a constitutional deprivation by the refusal of the visa, only then can a court look to whether the grounds for the refusal were facially legitimate and bona fide. That is an extremely narrow inquiry. And this court can't even get there because the plaintiffs in this case have not met the threshold requirement of establishing that there was a constitutional deprivation to a United States citizen. The Ninth Circuit made clear in Morales v. Cierto that there is no constitutional right for a United States citizen spouse to live in the United States with their foreign citizen spouse. Surely this court cannot expand that, the holding in Bustamante to find that there is a constitutional right to live in the United States when you are an adult to live with your foreign father here. We know all that. We know that. At least I know that. I'm sure everybody does. Yeah. So... So... So... How does Rivas apply in any way in this case, then? Your Honor, only to the extent that Rivas upheld the doctrine of consular nonreviewability. In that case, the government didn't contend, didn't make the argument that the limited inquiry explained in Bustamante should not even be extended in Rivas. And therefore, this court shouldn't find that Rivas held that there was, that the threshold inquiry was met in Rivas. And in Rivas, the one flaw in the procedure was that they failed to act on the motion to reconsider, or on the reconsideration. That case dealt with the waiver of inadmissibility, a Form I-601 waiver of inadmissibility that is adjudicated by United States Citizenship and Immigration Services. And therefore, that case shouldn't be held to require any further action in this case. Here, the visa was refused, a notice went out, and no more was required here. Okay. So, again, in your view, the case stands that he's gotten enough information to know generally what the area of concern is. He could file a new visa application and attempt to anticipate or deal with whatever suspicions may have existed, and then that would be adjudicated or decided by the consular office in the United Arab, the UA, the Emirates. That's correct, Your Honor. Assuming that this court could find that the threshold for making a limited inquiry into the visa refusal was met, then this court could look and determine that a facially legitimate and bona fide reason for the refusal was issued here. I'm assuming that we agreed with that outcome, but in terms of where that would leave him, then what you're saying is if we uphold it here as having been sufficient, that does not foreclose him from an effort to gain admission by filing a new and perhaps satisfactory application now that they have an idea of the area that is of concern. That's correct, Your Honor. Mr. Golkar is not prejudiced here. He can continue to submit visa applications abroad. Thank you, Your Honor. And then there's no requirement that he even gets a response after he files. He can just go through the same thing, just get the denial. Your Honor, Mr. Golkar did receive a response. He received an initial refusal notice. If the concern is that he needed an additional letter, that concern is allayed here because the government concedes that he was determined to be inadmissible for the ground that was stated in the letter. There's no reason why the court needs to look at this case further or determine that there was anything wrong with the dismissal under the doctrine of consular nonreviewability. Well, he certainly got rude treatment from the consulate. And he certainly got the response that tells him, you know, here's all in 15 pages, you go look for it. And the only time he got any information was what came through the congressman. And we don't have any. There's no letter that's in evidence on that. And his wife gets a visa, and so she's here. And, you know, it just seems that our government is acting not only, you know, rudely and arbitrarily and without concern for people who are seeking information about themselves and who apparently are willing to answer any questions. Or maybe we just got too much business, so we just don't give a damn, huh? May I respond? I know I'm out of time. But with respect, what happened here was not or based on the record as it exists, because we can see the record is limited because the court properly determined that the case should be dismissed under the doctrine of consular nonreviewability. But based on the allegations, the first visa refusal was on the 1201G grounds. That is a requirement for a consular officer to refuse the visa at the time the application is made. That is a regulatory and statutory requirement that had to be met. Then a consular officer needs to have the time to go back and determine that if it appears that an individual is in fact ineligible under, like the circumstances here, a national security ground, that time is afforded to the State Department and to the consular officers to make a proper determination to evaluate the evidence and then go back and make the determination under the specific ground. But they are not required to do that at the time the application is made. And it's not rudeness for a consular officer to refuse to provide further information where the statute specifically withholds or permits the consular officers to decline to provide the specific statutory ground. I understand that. You're just assuming they're all nice, wonderful people and they're kind people. You're assuming that. Am I right? I can't say, Your Honor. It's like we're all nice, kind judges. I hope they are. Can I ask a question, though? I'm serious about what I'm saying to you. Based on my own experiences, when I visited a consulate office and I watched the way they treated people, and the consulate that I met with looked like he was still sobering up in a very important part of this world. And I also know that our country passed a statute that all Philippine soldiers who assisted the armed forces, the Philippine scouts, were eligible for United States citizenship, but they had to go to the consulate in Manila. And what did we do? We withdrew the consulate in Manila. So they'd never been able, many of them, ever to get their United States citizenship, which we promised they would have. So there's a lot of things going on in these consulates. Thank you. So I'm not trying to be facetious about it. I'm serious about it. I don't think she thought you were being facetious. What? I don't think she thought you were being facetious. Well, but you interrupted me. I'm sorry. Yeah. I mean, I take these things seriously. You know, I've seen old people at our consulate treated very shabbily. We're not perfect. We ought to try to be a little nicer. That's all. I don't know who you could tell that to. I mean, there's a lot of mystery that goes on. Can I ask a question? Okay. Go ahead and ask the question. Just so I understand the procedure, the consulate makes a determination at the time of application. That's correct, Your Honor. That is a generalized determination. Yes or no, and then cites, if it's no, cites the relevant statute, which in this case was 1182A, which could have encompassed months or whatever. Is that correct? Now I believe some of the processes have changed, but I believe that there's a form, and it can even be as generic as 221G. Okay, but it's very general, very general. And then you say, this is what I want to get clarified, then what happens is if there is a denial, then the consular official does some investigation, or someone does, to find out whether or not that initial determination is well-grounded. Is that correct? Yes and no, Your Honor. You're correct in that initially there was a refusal under 221G. That is considered to be a final visa refusal. So what you're saying is that's all that the statute requires? That's correct, Your Honor. So whatever came after that in this case, in terms of narrowing it down to the specific subsection, was a gift. That's correct, Your Honor. Not statutorily required. That is correct. So if someone is turned down at such a general level, how would they, without the kind of subsidiary information that was acquired here, how is the visa applicant supposed to know in a resubmission what he should be responding to? Well, Your Honor, and I'm not sure if I was unclear about this, but not all initial visa refusals are refused under the generic 1201G or 12A. Sometimes it's immediately apparent, and then they get the specific ground. Let's stay with the one we've got here. Let's suppose that all that Mr. Golkar got was the initial determination without the Waxman supplement. How would he know what to put in a reapplication? Your Honor, as I mentioned in the briefs and as I mentioned earlier, the statute states that the government may withhold specific reasons for the denial where the person has been determined to be inadmissible under 1182A2. I'm sorry, Your Honor, maybe I'm not understanding your question. Well, you said that all he had to do was file another visa application, and you were explaining why, in response to Judge Pragerson's concern about rudeness, that it isn't rude, you just give them the denial, but then they have to have time to go determine whether or not it's a security violation. That's correct. They may need more time, and that's what they had to do. Okay. And so you were responding simply to say that what? I mean, why is that relevant if, in fact, they don't have to give them that information at all? That's correct, Your Honor. They don't have to give that information at all. So what were you responding to, the reason for the delay? I was trying to explain how the process works, but I was perhaps it was misleading if I meant that they always get a more particular statutory provision that explains the basis. But you've been clear that they're not entitled to it. I was just trying to understand in the process. You seem to be saying they have to be able to give a reason right at the application point. That's correct. As a matter of efficiency. And then if they decide that it is a security basis, why do they go further to decide if it's a security basis? If all they need to give is the reason at the beginning, what's the reason for somebody spending time to find out if it's a security basis? I don't know the exact response to that, Your Honor, but I can imagine that there are reasons why the State Department would want to look into individuals' background relating to national security. Well, I would assume that. But if they've already determined it at the front end, at the counselor level, well, I'm not going to, you know, that's the problem. I'm not understanding the process. And part, Your Honor, if I may very briefly, part of the reason why. I thought it was the same way, that they, you know, just to let them know that the applicant knows that something's happening, they sent out this, all these pages, and that they're going to look into it further and then they'll let them know. And it's specific. You know, maybe not that particular event, but, you know, it's something that's general, but a little bit more focused. I mean, you go through this, I mean, it's got every misdeed and disease and all kinds of stuff in here. I understand that it might be, might seem. I'm not blaming you. I don't think you need to. I'd like to see you as Secretary of State. I think you'll change the. I think we've exhausted the subject. We've exhausted it. I have no more questions. Thank you, Your Honors. Thank you. So you're going to file another application? Well, Your Honor. Did you know you could file another application? Yes. Your Honor, I was aware of that. But here's the issue I wanted to address. It was a question you specifically asked. You said that if there's a denial, do they deserve any hearing or interview? And the government counsel said no, they only get an answer yes or no. But that's not entirely true. The Foreign Affairs Manual says that they are entitled to a detailed interview. There was no interview. He was given a letter. He was submitted an application, and they returned a letter saying you're denied. He didn't get the detailed interview, and he was not provided the opportunity to submit rebuttal information. Is that true? Is that true in a security denial? Specifically in a security denial. That's specifically the Foreign Affairs Manual's procedure in how you handle security-related issues. And you've cited that in your brief. It is. It's cited, and I even quoted the Foreign Affairs Manual. And my point is that never happened here. Had that happened, he would have known. And there's no way of knowing if we resubmit the application, is that going to happen again? Is he just going to get another letter saying no, or is he going to get the procedure that the Foreign Affairs Manual requires? I think we have the point, Counsel. Okay. Thank you. Thank you. We submit. Thank you, Your Honor. All right. Thank you. Very enlightening.
judges: Daniel, Pregerson, Fisher